**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 30 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

VERONICA PACHECO,

      Plaintiff-Appellant,

v.

WHITING FARMS, INC.; THOMAS
WHITING, individually; and N. LYLE
JOHNSTON, individually,

      Defendants-Appellees.

No. 03-1170

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 01-RB-851 (CBS))**

---

Submitted on the briefs:[*]

Patricia L. Medige, Colorado Legal Services, Denver, Colorado, for Plaintiff-Appellant.

Sam D. Starritt and Michael C. Santo, Dufford, Waldeck, Milburn & Krohn, LLP, Grand Junction, Colorado, for Defendants-Appellees.

---

Before **SEYMOUR**, **BALDOCK**, and **LUCERO**, Circuit Judges.

---

    [*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case therefore is ordered submitted without oral argument.

**BALDOCK**, Circuit Judge.

_____

Plaintiff Veronica Pacheco sued Defendants Whiting Farms Inc. and its controlling owners alleging they failed to pay her overtime wages and terminated her employment in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219. FLSA generally requires employers to pay their employees one and one-half times the employee's regular rate of pay (overtime) for each hour worked in excess of forty hours during any given week. 29 U.S.C. § 207(a)(1). FLSA's overtime wage requirements do not apply, however, "with respect to . . . any employee employed in agriculture[.]" Id. § 213(b)(12). FLSA also prohibits retaliation against an employee because she engaged in protected activity under the Act. Id. § 215(a)(3).

The parties filed cross-motions for summary judgment. The district court granted Defendants' motion for summary judgment, holding Defendants were not required to pay Plaintiff overtime wages under FLSA's "agricultural exemption" and Defendants did not terminate Plaintiff in violation of FLSA's anti-retaliation provision.[1] On appeal, Plaintiff argues the district court erred in granting summary judgment because (1) she was not an agricultural employee exempt from the payment of overtime wages under FLSA, and (2)

_____

[1] The district court also held FLSA's anti-retaliation provision precluded Plaintiff's state law wrongful discharge claim. See Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1399 (10th Cir. 1997). Plaintiff does not address the district court's dismissal of her state law claim on appeal. Plaintiff has therefore waived the issue. Tran v. Trustees of State Colleges in Colo., 355 F.3d 1263, 1266 (10th Cir. 2004).

2

genuine issues of material fact exist regarding whether Defendants terminated her for requesting overtime wages. We have jurisdiction under 28 U.S.C. § 1291. We review the grant of summary judgment de novo, applying the same standard as the district court. Welding v. Bios Corp., 353 F.3d 1214, 1217 (10th Cir. 2004). Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Id. Applying this standard, we affirm.

## I.

Thomas Whiting and N. Lyle Johnston are the president and vice-president, respectively, of Whiting Farms, Inc. (collectively "Defendants"). Defendants "raise chickens for feathers." Defendants breed, raise, euthanize, and processes chickens for their "pelts" or "hackle." Hackle consists of feathers still attached to the skin (pelts) of the chickens. Hackle is eventually used to tie fishing-flies.

From conception to compost, the chickens raised and euthanized at Whiting Farms never leave Defendants' property. Processing the chickens essentially involves euthanizing the chickens, removing the chickens' pelts, drying the pelts to remove moisture and fat, and trimming the pelts into the desired shape.[2] The pelt is next graded to determine its value. After grading, the pelt is sent to the packaging department. Packaging employees then separate the pelts according to their previously assigned grade

---

[2] We recently described Defendants' chicken processing operations in Rodriguez v. Whiting Farms, Inc., 360 F.3d 1180, 1183-84 (10th Cir. 2004), and need not repeat the process in detail here.

and color, stamp the back of the pelt with its grade designation, and make a record of the pelt.  Depending on demand, the pelt is then either placed in bulk storage or packaged.

A pelt goes to storage if it is not needed to fill a current order.  The pelt is stored in its natural state (i.e., not in a box).  The pelt is perishable if exposed to water or insect infestation; however, if the pelt is stored in a safe and reasonably cool environment it will last years.  Conversely, the pelt is packaged immediately if it is needed to fill an order.  To package a pelt, an employee staples the pelt onto a board and places it into a zip-lock bag.  Next, the packaging employee places a computer generated bar-code on the bag and scans the bar-code, which places the product into a computer operated inventory system.  The packaged pelt is then taken to the shipping department.  UPS picks up the pelts from the shipping department and delivers them to retailers.

Plaintiff began working in Defendants' packaging department in 1996.  Plaintiff's position did not require any specialized training or experience.  In August 1999, Defendants promoted Plaintiff to "packaging foreperson."  As foreperson, Plaintiff directed day-to-day activities of the packaging staff, scheduled days off, ensured packaging inventories were kept at proper levels, and continued to package pelts.  Defendants implemented a new packaging system shortly after Plaintiff's promotion, which operated pursuant to a "Packaging Priority Report."  The report informs packaging employees what products need to be packaged to meet the current market demand.  Packaging employees then prioritize their duties according to the report.

4

Plaintiff's employment relationship with Defendants deteriorated after implementation of the Packaging Priority Report system. Plaintiff disagreed with how the new system allocated packaging employees' duties and often felt the Packaging Priority Report was wrong. In February 2000, Defendants met with Plaintiff twice because she was not packaging product correctly. After the second meeting, Defendants informed Plaintiff that further resistance to change would constitute misconduct and could result in disciplinary action. On August 3, 2000, Defendants met with Plaintiff a third time because she had missed a meeting with her immediate supervisor regarding the allocation of job duties within the packaging department and allegedly started a rumor her supervisors were "out to get her." After the meeting, Defendants suspended Plaintiff for one and one-half days without pay for insubordination and misconduct. Defendants also put Plaintiff on notice she would be subject to further disciplinary action, including termination, if her unacceptable behavior continued.

Around August 26, 2000, Plaintiff learned employees in the shipping department received overtime wages. Plaintiff regularly worked over forty-hours per week in the packaging department. Defendants paid Plaintiff her regular rate of pay for all hours worked, but did not pay her overtime wages for those hours worked in excess of forty. Accordingly, Plaintiff asked Defendant Johnston if the "packaging department could get overtime like shipping." Defendant Johnston appeared "nervous and shocked" upon Plaintiff's inquiry but nevertheless informed Plaintiff he would look into the matter.

5

Later that day, Defendant Johnston explained to Plaintiff that packaging employees did not receive overtime wages because they were considered "agricultural." Defendant Johnston further explained shipping employees were not considered "agricultural," and thus entitled to overtime wages, because shipping employees worked with products not wholly produced on Whiting Farms. Plaintiff responded "okay" and went back to work. Plaintiff never mentioned overtime wages to Defendants again.

In October 2000, Plaintiff disregarded her immediate supervisor's orders regarding the allocation of job duties within the packaging department. Defendant Johnston was notified of the situation. Upon arriving in the packaging department, Defendant Johnston observed a large amount of backlogged product and decided Plaintiff needed to be disciplined for her insubordination. After reviewing the situation, Defendants decided Plaintiff's termination was in the best interest of the company. Defendant Whiting made the ultimate decision to terminate Plaintiff because her failure to follow reasonable work-related instructions under the Packaging Priority Report system hindered productivity. On October 17, 2000, Defendants terminated Plaintiff.

II.

Plaintiff first argues the district court incorrectly held she was not entitled to overtime wages under FLSA's agricultural exemption. We narrowly construe FLSA exemptions. Mitchell v. Kentucky Finance Co., 359 U.S. 290, 295 (1959). An employer

bears the burden of showing its practices plainly and unmistakably fall within the exemption. Ackerman v. Coca-Cola Enter., Inc., 179 F.3d 1260, 1264 (10th Cir. 1999).

A.

FLSA prohibits any person from violating the maximum hour provisions of the Act. 29 U.S.C. § 215(a)(2). FLSA's maximum hour provisions require, among other things, employers to pay their employees at a rate not less than one and one-half times the employee's regular rate of pay for each hour, or fraction thereof, the employee worked over forty-hours in a workweek. Id. § 207(a)(1). Section 213(b), however, sets forth several industry-specific exemptions from the Act's maximum hour provisions. Id. § 213(b)(1)-(30). FLSA's agricultural exemption provides the Act's maximum hour provisions "shall not apply with respect to . . . any employee employed in agriculture[.]" Id. § 213(b)(12). "The agricultural exemption was meant to apply broadly and to embrace the whole field of agriculture, but it was meant to apply only to agriculture; thus the critical issue is what is and what is not included within that term." Rodriguez v. Whiting Farms, Inc., 360 F.3d 1180, 1185 (10th Cir. 2004) (internal quotations and citation omitted). FLSA provides:

> "Agriculture" includes farming *in all its branches* and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities . . ., the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer *or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.*

7

29 U.S.C. § 203(f) (emphasis added).

FLSA's definition of agriculture "includes farming in both a primary and a secondary sense." Bayside Enter., Inc. v. NLRB, 429 U.S. 298, 300 (1977). Farming in all its branches constitutes primary farming. Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. 755, 762 (1949); 29 C.F.R. § 780.105(b). "Primary farming includes the raising of poultry." Holly Farms Corp. v. NLRB, 517 U.S. 392, 399 (1996); 29 U.S.C. § 203(f); 29 C.F.R. § 780.108. "Secondary farming has a broader meaning, encompassing . . . any practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." Holly Farms, 517 U.S. at 398 (internal quotations and citation omitted); 29 C.F.R. § 780.105(c). To constitute secondary farming, the practice must be (1) performed by a farmer *or* on a farm, and (2) incident to *or* in conjunction with such farming operations. Rodriguez, 360 F.3d at 1185-86.

In Rodriguez, a related case, two employees sued Whiting Farms alleging it failed to pay them overtime wages in violation of FLSA. Id. at 1184. Whiting Farms employed plaintiffs as skinners and trimmers in its chicken processing operations. Id. The issue was whether the skinning and trimming of chickens constituted secondary farming. Id. at 1186. We found the skinning and trimming of chickens was a subordinate and necessary task incident to Whiting Farms's agricultural operations. Id. at 1190. Accordingly, we

8

held FLSA exempted Whiting Farms from paying its employees who skinned and trimmed chickens overtime wages because the practices constituted secondary agriculture. Id.

B.

In this case, Plaintiff argues packaging employees are too far removed from farming operations to be considered agricultural. Plaintiff points out packaging employees do not handle any live chickens, but instead use a computer to generate bar codes, read priority reports, and scan the product into the computer (much like a supermarket employee), all of which "demonstrates a level of industrialization that brings the work beyond the realm of agriculture." We disagree. The raising of chickens on Whiting Farms constitutes primary farming under FLSA. Holly Farms, 517 U.S. at 399. The skinning and trimming of chickens at Whiting Farms constitutes secondary farming under FLSA. Rodriguez, 360 F.3d at 1190. The chicken pelts are brought unchanged to the packaging department after they are skinned and trimmed. Plaintiff admits the pelts are packaged on a farm. The only question then is whether Defendants' packaging employees are performing a practice incident to or in conjunction with the primary and secondary farming operations at Whiting Farms when they place the pelts (1) into bulk storage, or (2) onto a board and into a zip-lock bag with a bar-code affixed to it, which is then scanned into a computer inventory system and delivered to the shipping department.

9

We need not look far for the answer.  Secondary farming encompasses any practices performed on a farm as an incident to or in conjunction with farming operations, "including preparation for market, *delivery to storage . . .* or *to carriers for transportation to market*."  29 U.S.C. § 203(f) (emphasis added); see also Holly Farms, 517 U.S. at 398.  Defendants' employees who skin and trim the chickens begin preparing the pelts for market.  See Rodriguez, 360 F.3d at 1190.  Packaging employees, such as Plaintiff, then complete the job by either "delivering the pelt to storage" or "to carriers for transportation to market."  See 29 U.S.C. § 203(f).  Specifically, packaging employees deliver the pelt to storage if it is not needed to fill a current order; or, if the pelt is needed to fill an order, the pelt is packaged and delivered to the shipping department where UPS picks up the pelt and transports it to market.  Plaintiff is therefore engaged in secondary farming under FLSA because she performs tasks incident to and in conjunction with Defendants' other agricultural operations.  The Department of Labor (DOL) regulations compel the same conclusion; as we explained in Rodriguez:  "Whiting Farms removes, washes, dries, trims, *and packages* the pelts.  This type of processing appears to fall directly in line with the preparation for market considered incidental to farming under the regulations."  Rodriguez, 360 F.3d at 1188 (emphasis added).

Plaintiff also argues Defendants' processing operations change the "raw and natural state" of the pelt thereby making the process more akin to manufacturing than to agriculture.  See Mitchell v. Budd, 350 U.S. 473, 481-82 (1956) (holding a process that

10

results in changes to the natural state of the product is more akin to manufacturing than to agriculture); 29 C.F.R. § 780.129 (explaining manufacturing and industrial operations do not fall under the definition of secondary farming). We rejected this argument in Rodriguez because the "changes to the product are not substantial and the pelt itself is preserved in much the same state as it was prior to processing." 360 F.3d at 1188. In Rodriguez, we explained that comparing Defendants' practices with the fur industry is persuasive because of the uniqueness involved in raising chickens for their feathers. Id. Under the regulations, preparation of fur for market includes "[r]emoving the pelt, scraping, drying, *putting on boards*, and *packing*." 29 C.F.R. § 780.151(m) (emphasis added). Defendants' packaging employees also place the substantially unchanged pelts onto boards and into packages. Thus, the packaging duties at Whiting Farms constitute secondary farming under the most analogous regulations.[3] See id.

---

[3] Plaintiff further argues the district court erred in failing to consider a DOL opinion letter concluding Defendants' chicken processing operations, including packaging, were not agricultural activities. Defendants, however, presented two DOL reports, which concluded the agricultural exemption "applied to all phases of Whiting Farms' operations." The DOL issued those reports prior to its opinion letter and after inspecting Whiting Farms. Agency opinion letters are entitled to deference. Raymond B. Yates, M.D., P.C., Profit Sharing Plan v. Hendon, 124 S. Ct. 1330, 1342 (2004). An agency interpretation that conflicts with the agency's earlier interpretation is, however, entitled to considerably less deference than a consistently held position. Watt v. Alaska, 451 U.S. 259, 273 (1981). We agree with the Rodriguez panel that the DOL's analysis in the opinion letter is not "particularly persuasive." 360 F.3d at 1189. Moreover, we have now concluded twice that Defendants' chicken processing operations constitute secondary farming under FLSA. The DOL's opinion letter is thus entitled to little, if any, deference. See General Dynamics Land Sys., Inc. v. Cline, 124 S. Ct. 1236, 1248 (2004) (explaining no deference is owed to an incorrect agency interpretation).

11

Furthermore, we reject Plaintiff's suggestion that modernization of Defendants' farming operations bring them outside FLSA's definition of agriculture. As the Supreme Court explained:

> Agriculture, as an occupation, includes more than the elemental process of planting, growing and harvesting crops. There are a host of incidental activities which are necessary to that process. . . . Economic progress . . . is characterized by a progressive division of labor and separation of function. . . . Thus, the question as to whether a particular type of activity is agricultural is not determined by the necessity of the activity to agriculture nor by the physical similarity of the activity to that done by farms in other situations. The question is whether the activity in the *particular case* is carried on as part of the agricultural function or is separately organized as an independent productive activity.

Farmers Reservoir & Irrigation Co., 337 U.S. at 760-61 (emphasis added). At Whiting Farms, storing and packaging the pelts are part of the agricultural function of raising chickens for their feathers. The packaging department is certainly not organized as an independent productive activity. To the contrary, the packaging department would cease to exist if Defendants stopped harvesting chickens. Moreover, the Supreme Court has explained "[t]here is no reason to construe the FLSA so as to discourage modernization in performing [agricultural] function[s]." Maneja v. Waialua Agric. Co., 349 U.S. 254, 261 (1955). That Defendants use a computer and scanning equipment rather than a pencil and paper to keep track of their pelt inventory is therefore unremarkable. In sum, Defendants have demonstrated the packaging operations at Whiting Farms plainly and unmistakably fall within the agricultural exemption because those practices constitute secondary

12

farming under FLSA.  Defendants are therefore exempt from paying Plaintiff overtime wages.  29 U.S.C. § 213(b)(12).

## III.

Plaintiff next argues the district court erred in granting summary judgment on her retaliation claim.

## A.

FLSA prohibits any person from retaliating against an employee for asserting her rights under the Act.  Specifically, FLSA provides:

> [I]t shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [FLSA], or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee[.]

29 U.S.C. § 215(a)(3).  Relying on the remedial nature of FLSA, see Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 292 (1960), we have held an employee's unofficial assertion of rights under § 215(a)(3) is also protected activity.  Love v. Re/Max of Am., Inc., 738 F.2d 383, 387 (10th Cir. 1984).

FLSA retaliation claims are analyzed under the familiar three-pronged McDonnell Douglas burden-shifting framework.  Richmond v. ONEOK, Inc., 120 F.3d 205, 208 (10th Cir. 1997).  Under the first prong of the McDonnell Douglas framework, the employee must establish a prima facie case of retaliation by demonstrating (1) she engaged in protected activity under FLSA, (2) she suffered an adverse employment action

13

contemporaneous with or subsequent to the protected activity, and (3) a causal connection between the protected activity and the adverse employment action. Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1394 (10th Cir. 1997). An employee's request for overtime wages is a protected activity in the form of an unofficial assertion of FLSA rights. Id. An adverse employment action is a detrimental change in the terms or conditions of employment, such as termination. Id. at 1395 & n.4. An employee can demonstrate a causal connection between the protected activity and the adverse employment action directly or circumstantially. Id. A causal connection can be demonstrated circumstantially through evidence that justifies an inference of retaliatory motive, such as a "very close" temporal proximity between the protected activity and adverse employment action. Id.; see also Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).

Under the second prong of the McDonnell Douglas framework, the burden of production shifts to the employer to offer a legitimate non-retaliatory reason for the adverse employment action. Id. at 1178. The employer need not prove the absence of retaliatory motive; rather, the employer need only produce evidence that would dispel the inference of retaliation. Conner, 121 F.3d at 1395.

Under the third prong of the McDonnell Douglas framework, the burden shifts back to the employee to show genuine issues of material fact exist regarding whether the employer's proffered reason is unworthy of credence. Anderson, 181 F.3d at 1179. To

14

do so, an employee can produce direct evidence of retaliation or other evidence showing the employer's proffered non-retaliatory reasons for the adverse action were pretextual. Conner, 121 F.3d at 1396-97. An employee demonstrates pretext with evidence the employer's proffered reasons are so weak, implausible, or inconsistent a reasonable jury would not believe them. Anderson, 181 F.3d at 1179; Richmond, 120 F.3d at 209. Conclusory allegations, conjecture, or mere allegations of impartial treatment are insufficient to show pretext. Id.; Conner, 121 F.3d at 1398.

## B.

In this case, Plaintiff engaged in protected activity when she requested overtime wages. Plaintiff's termination constituted an adverse employment action. Plaintiff has not presented any evidence of a causal connection between her request for overtime and termination; however, Plaintiff appears to argue she circumstantially demonstrated a causal connection because her termination occurred nearly two months after her overtime inquiry.[4] We will *assume without deciding* the nearly two months between Plaintiff's

---

[4] Plaintiff also argues the district court inappropriately granted summary judgment because genuine issues of material fact exist regarding the timing of her overtime inquiry and Defendant Johnston's reaction to that inquiry. We disagree. Genuine issues of material fact do not exist with regard to either the timing of Plaintiff's overtime inquiry or Defendant Johnston's reaction to that inquiry. With respect to timing, Plaintiff testified she made the overtime inquiry "at or about" August 26, 2000. Thus, no issue exists with respect to when Plaintiff requested overtime. With respect to Defendant Johnston's reaction, we assume Johnston was initially shocked, nervous, and agitated by Plaintiff's inquiry. Defendant Johnston nevertheless returned the afternoon of Plaintiff's inquiry and reasonably explained to her why shipping employees received overtime wages, and packaging employees did not. Farmers Reservoir & Irrigation Co., 337 U.S. at 766 n.15.

15

request for overtime and termination is sufficient to satisfy the causation element of her prima facie case. See Anderson, 181 F.3d at 1179. We thus *assume* Plaintiff established a prima facie case of retaliation.

The burden of production then shifted to Defendants to offer a legitimate non-retaliatory reason for the adverse employment action. Defendants' non-retaliatory reason for terminating Plaintiff was her refusal to follow work-related instructions. Plaintiff thus had the ultimate burden of proving Defendants' proffered reason was a pretext for unlawful retaliation. Plaintiff failed to carry her ultimate burden because she did not present *any* evidence on which a reasonable jury could infer retaliatory motive or disbelieve Defendants' proffered reason for terminating her employment. Summary judgment on Plaintiff's retaliation claim under § 215(a)(3) was therefore appropriate.

For the foregoing reasons, the district court's order granting Defendants' motion for summary judgment is AFFIRMED.

03-1170, Pacheco v. Whiting Farms
**LUCERO**, J., Circuit Judge, concurring.

Because Rodriguez v. Whiting Farms, Inc., 360 F.3d 1180 (10th Cir. 2004)

dictates the analysis and result of the majority, I am compelled to join.